## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BRENDA SOKEL,

     Plaintiff,

v.

SUMMIT POLYMERS, INC.,

     Defendant.

Case No.

Hon.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St., Suite 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

---

There is no other pending or resolved civil action arising out
of this transaction or occurrence alleged in the Complaint

## COMPLAINT AND JURY DEMAND

Plaintiff Brenda Sokel ("Plaintiff"), by and through her attorneys, HURWITZ LAW PLLC, hereby alleges as follows:

## INTRODUCTION

1.    This is a civil action for money damages, liquidated damages, costs, attorneys' fees and other relief against Defendant Summit Polymers, Inc. ("Defendant"). Plaintiff asserts claims of age discrimination in violation of Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* and Michigan's Elliott-Larsen Civil Rights Act (the "ELCRA), M.C.L. 37.2101, *et seq.*, disability discrimination and failure to accommodate in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and disability discrimination in violation of Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL 37.1101 *et seq.*

## PARTIES AND JURISDICTION

2.      Plaintiff Brenda Sokel is an individual residing in Monroe, Monroe County, Michigan.

3.      Summit Polymers, Inc. is a Domestic Profit Corporation with its principal place of business located in Portage, Kalamazoo County, Michigan.

4.      This Court has jurisdiction pursuant to 28 U.S.C.A. § 1331 (federal question jurisdiction) over the claims under the ADEA and ADA.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C.A. § 1367 over Plaintiff's state law claims.

5.      Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b)(2), as it is the district where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

2

6. The facts and unlawful employment practices within the meaning of the ADEA, ELCRA, ADA, and PWDCRA giving rise to this Complaint occurred within the Eastern District of Michigan.

7. Plaintiff filed charges of age and disability discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 30, 2025, and she received her Notice of Right to Sue on January 14, 2026.

## GENERAL ALLEGATIONS

### Plaintiff's Exemplary 20-Year Employment Record

8. Defendant is a for-profit automotive supplier that supplies interior kinetic and decorative systems to major automotive manufacturers.

9. Plaintiff began her employment with Defendant on or about November 14, 2005, as a Sales Account Manager in the Dearborn sales office.

10. Over her 20-year career with Defendant, Plaintiff was promoted to Senior Sales Account Manager and managed approximately 90% of Defendant's Ford Motor Company console accounts, which represents approximately $300 million in annual business.

11. Throughout her entire 20-year tenure, Plaintiff never missed a single sales goal.

12. Plaintiff never received a single negative performance review.

13. Plaintiff never received any formal or informal disciplinary warnings.

3

14. Plaintiff was never placed on a performance improvement plan.

15. Plaintiff's performance reviews consistently described her as having "excellent" attention to detail, being "very detail oriented, working independently, being "an asset to the Ford team," and bringing "a positive attitude to work."

16. In her 2021 performance review, Plaintiff's supervisor praised her, stating: "Brenda brings a positive attitude to work and cooperatively supports the Ford team's workload without complaints.  She is very detailed oriented and works independently getting her job done.  She is an asset to the Ford team."

17. In her 2020 performance review, Plaintiff's supervisor wrote: "Thank you for the great year.  I appreciate your support and cooperation during the Covid-19 layoffs."

18. In her 2019 performance review, Plaintiff achieved a KRA score of 1,210 out of a possible 1,300, and her supervisor praised her: "Brenda is very proficient in her programs and daily activities.  She was successful with the multiple launches on many part numbers keeping the commercial issues under control.  Thank you for another productive year with Summit."

19. In her 2018 performance review, Plaintiff exceeded her sales goal, achieving $4.149 million against a target of $2.5 million, and her supervisor commented: "Brenda is very successful in managing her programs.  Her attention to detail is perfectly suited for the complexity" of her work.

20.    Plaintiff received annual bonuses every year of her employment, including years when most other sales employees did not receive bonuses.

21.    Plaintiff successfully launched every program she acquired for Defendant, including the P473, D258, U502, P708, P558, U625, U611, U717, and U718 console programs.

22.    Plaintiff had no history of attendance problems, with her attendance calendars showing only authorized vacation days, holidays, and protected FMLA leave.

### Plaintiff's Cancer Diagnosis and Medical Treatment

23.    In May 2022, Plaintiff was diagnosed with aggressive triple-positive breast cancer.

24.    Plaintiff underwent a double mastectomy in 2022.

25.    Plaintiff subsequently underwent three reconstruction surgeries.

26.    Plaintiff endured three months of chemotherapy.

27.    Plaintiff underwent a year of immunotherapy treatment.

28.    Plaintiff took 12 weeks of FMLA leave in 2022 for her cancer treatment, during which time she continued to work remotely and perform her duties without issue.

29.     As a result of her cancer treatment, Plaintiff suffers from severe neuropathy (nerve damage), chronic headaches, brain fog, concentration limitations, chronic fatigue, and depression.

30.     Plaintiff's chemotherapy-induced neuropathy occasionally required her to work from home.

31.     At all relevant times, Plaintiff visited her neurologist every six weeks for treatment of her headaches and neuropathy.

32.     At all relevant times, Plaintiff was examined by her oncologist every six months for cancer screenings and bloodwork.

33.     At all relevant times, Plaintiff was examined by her primary care physician very six months to review her overall health and medications.

34.     In April 2024, Plaintiff's medical team advised her to have a fully hysterectomy to reduce hormone levels due to her high risk of recurring cancer.

35.     During the hysterectomy surgery, Plaintiff's surgeon found several tumors, cysts, and a mass, which in the surgeon's words, included "too many things to count."

36.     Plaintiff took six weeks of FMLA leave from April 11, 2024 to June 6, 2024 for her hysterectomy, during which time she again worked in a hybrid capacity without issue.

37.     Throughout her cancer treatment and recovery, Plaintiff maintained her exemplary work performance, as evidenced by her 2024 performance review stating: "Brenda communicates with her teams daily.  She updates them on progress she's made with issues and follows through on lingering items until resolution has been made.  She is organized and participates in activities beyond the KRAs set for her."

38.     At all relevant times, Plaintiff's supervisor, Michael Hankerd, Director of Sales for Ford, and other members of her team were aware of her medical condition and the need for continuous cancer screenings, doctor visits, and occasional remote work.

**The Sales Office Relocation, Defendant's Knowledge of Plaintiff's Needs, The Discriminatory 540-Minute Policy, and Hiring of Plaintiff's Replacement**

39.     In 2024, Defendant's sales office relocated from its previous location to Plymouth, Michigan.

40.     Following this relocation, Doug Sadrack, Defendant's Vice President of Sales, told Plaintiff that he expected to see her "Even less in the office" after the move.

41.     In or about February 2025, Defendant hired Stacy Watkins, age 45, as a "Sales Manager," a position with higher earning capacity and higher level than Sales Account Manager.

42.     Upon information and belief, Ms. Watkins is younger than Plaintiff and does not suffer from any disability.

7

43.     Ms. Watkins disclosed to Plaintiff a longstanding friendship with Doug Sadrack, Defendant's Vice President of Sales, and his girlfriend.

44.     Plaintiff was assigned to train Ms. Watkins and transferred one of her accounts to Ms. Watkins.

45.     On February 3, 2025, Defendant's sales force was required to appear in-person at the Plymouth office to welcome Ms. Watkins, where Ford team members were informed that remote work was prohibited under a newly enforced "540-minute policy."

46.     Prior to the implementation of the 540-minute policy in February 2025, the Sales Account Manager position had historically been a hybrid work position, with employees regularly working from home.

47.     The 540-minute policy required Ford team members to be present in the office for a minimum of nine hours daily (540 minutes), tracked by badge swipes.

48.     Ford team members were further required to log arrival times, daily tasks, and departure times, with customer activities outside normal hours excluded from the 540-minute count.

49.     The 540-minute policy did not apply to the GM, Stellantis, or Nissan sales teams.

50.     The Director for GM/Stellantis/Nissan openly stated to Plaintiff and other account managers that his team was not being "targeted."

8

51.     Plaintiff was aware that the Stellantis Account Manager appeared in the office only 2-3 times monthly, the Sales Director for GM/Stellantis/Nissan appeared in the office only 1-2 times weekly, and the Senior Account Manager for GM appeared in the office only 1-2 times weekly.

52.     Upon information and belief, none of these individuals who were exempt from the 540-minute policy suffer from disabilities.

53.     Plaintiff repeatedly asked her supervisor, Michael Hankerd, if she could occasionally work remotely due to her ongoing medical needs, cancer screenings, and appointments.

54.     Plaintiff repeatedly told Mr. Hankerd that she needed to work from home to accommodate her disability-related limitations and medical appointments.

55.     Despite Plaintiff's repeated requests for accommodation, Defendant never engaged in the interactive process required under the ADA.

56.     Defendant never proposed any alternative accommodations to Plaintiff.

57.     Defendant never conducted any individualized assessment of Plaintiff's accommodation needs.

58.     Defendant never explored whether remote work or a modified schedule would impose an undue hardship.

9

59. Defendant categorically refused to consider remote work as an accommodation without any individualized assessment of Plaintiff's needs or exploration of reasonable accommodations.

60. Michael Hankerd, Plaintiff's supervisor, acknowledged in Defendant's EEOC response that "he was aware that Ms. Sokel was experiencing symptoms and she had proposed to him that she be allowed to work from home."

61. Hence, the interactive process was triggered when Plaintiff asked Mr. Hankerd to work remotely in her efforts to comply with the 540-minute policy.

62. From February 2025 to April 2025, Plaintiff endeavored to comply with the 540-minute policy despite her need for regular cancer screenings and occasional remote work while in remission, a practice she had successfully maintained for two decades.

63. Mr. Hankerd informed Plaintiff that Andrea Haas, Defendant's President and CEO, repeatedly singled Plaintiff out during meetings with him and Mr. Sadrack, specifically monitoring Plaintiff's attendance.

64. Mr. Hankerd further informed Plaintiff that Ms. Haas ridiculed Plaintiff for occasionally working only 8-8.5 hours in the office rather than the required 9 hours.

65. The 540-minute policy was designed by Mr. Sadrack and Ms. Haas to push Plaintiff out of the company and replace her with Ms. Watkins.

**Plaintiff's Pretextual Termination**

66.     On June 5, 2025, Plaintiff was terminated under the stated reason of "reduction in force/permanent layoff."

67.     Plaintiff was the sole Sales Account Manager terminated in this alleged reduction in force.

68.     Plaintiff was instructed to collect her belongings immediately and was informed that her medical benefits would cease at midnight that same day.

69.     Plaintiff's termination occurred just four months after Ms. Watkins was hired as a "Sales Manager" in February 2025.

70.     Ms. Watkins was trained by Plaintiff on the management of existing accounts and was given accounts that were previously managed by Plaintiff.

71.     Ms. Watkins performs substantially the same duties that Plaintiff performed.

72.     Defendant's EEOC submission states that its justification for Plaintiff's termination was that "Summit decided to exit business with VW and BMW," which "Freed up the Sales Manager for those accounts," allowing work to be "redistributed."

73.     However, Plaintiff did not manage VW or BMW accounts; 100% of Plaintiff's work was related to Ford.

11

74. On December 19, 2025, just over six months after Plaintiff's termination, Defendant posted a job opening for "Senior Sales Account Manager"—Plaintiff's exact former position—on its online job portal.

12/30/25, 3:50 PM                    Senior Sales Account Manager | Dayforce Jobs

Sign In  ☰

## Senior Sales Account Manager       Req #1816

Dearborn Office, 15101 Commerce Dr, Dearborn, Michigan, United States of America

Apply       ⌁ Share

### Job Description
Posted Friday, December 19, 2025 at 12:00 AM

Summit Polymers is a leading, global supplier of automotive interior systems including consoles, door panels, and instrument panels. With over 50 years serving the industry, we deliver engineering and product excellence to our customers, on time, in budget, with the latest innovations.

75. The job description for the posted Senior Sales Account Manager position includes managing "day-to-day commercial activities on pre-production, production, and post production (service) programs" and building "strong, long-term relationships with customer purchasing, engineering/program management, and supplier quality"—the exact duties Plaintiff performed for 20 years.

76. The posting of this position directly contradicts Defendant's stated justification that Plaintiff's position was eliminated due to a reduction in force.

12

77.    The job posting demonstrates that Defendant did not eliminate Plaintiff's position, but rather terminated Plaintiff and is now seeking to fill her position with a younger, non-disabled replacement.

78.    Prior to Plaintiff's termination, in April 2025, Defendant also terminated Jay Milbrandt, the Cost Estimating Manager, who had recently been disabled by a stroke, demonstrating a pattern of eliminating employees with disabilities.

79.    Plaintiff was qualified to perform the essential functions of her job with or without reasonable accommodation at the time of her termination.

80.    Plaintiff could have performed her essential duties under a hybrid schedule, as she had successfully done for nearly two decades.

81.    Other employees at Defendant who did not have disabilities were permitted to work remotely or in hybrid arrangements without being subjected to the 540-minute policy.

82.    But for Plaintiff's age, she would not have been terminated.

83.    But for Plaintiff's disability, she would not have been terminated.

84.    Defendant's conduct was willful, intentional, and undertaken with malice or reckless indifference to Plaintiff's federally and state-protected rights.

85.    Plaintiff was instructed to collect her belongings and informed her medical benefits would cease at midnight.

13

86. Upon information and belief, Plaintiff was replaced by a younger employee.

87. But for Plaintiff's age, she would not have been terminated.

88. But for Plaintiff's disability, she would not have been terminated.

**COUNT I**
**VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT**
**DISPARATE TREATMENT BASED ON AGE**

89. Plaintiff incorporates by reference herein the foregoing paragraphs and allegations.

90. At the time of her termination, Plaintiff was at least 40 years old and therefore a member of a protected class under the ADEA.

91. Plaintiff was qualified for her position as Senior Sales Account Manager, as evidenced by her 20 years of exemplary performance, consistently positive performance reviews, with KRA scores ranging from 820 to 1,210, perfect record of meeting all sales goals, and multiple successful program launches.

92. Despite her exemplary qualifications and performance, Plaintiff was subjected to adverse employment actions, including being subjected to the discriminatory 540-minute policy, being singled out and ridiculed by the CEO for her attendance, and ultimately being terminated on June 5, 2025.

93.     Plaintiff was replaced by Ms. Stacy Watkins, age 45, a younger employee with no disclosed disabilities and significantly less experience in the automotive industry.

94.     Defendant hired Ms. Watkins just four months before terminating Plaintiff, assigned Plaintiff to train Ms. Watkins, and transferred Plaintiff's accounts to Ms. Watkins.

95.     Defendant proffered reason for Plaintiff's termination—a "reduction in force/permanent layoff"—is demonstrably false and pretextual, as evidenced by: (a) the hiring of Ms. Watkins four months earlier; (b) Ms. Watkins performing Plaintiff's duties; (c) Plaintiff being the only Sales Account Manager terminated; (d) the absence of any financial documentation supporting the RIF; and (e) Defendant's posting of Plaintiff's exact position on December 19, 2025, just six months after her termination.

96.     Similarly situated younger employees, including Ms. Watkins, were treated more favorably than Plaintiff and were not terminated.

97.     Defendant's conduct was intentional, willful, and undertaken with malice or reckless indifference to Plaintiff's rights under the ADEA.

98.     As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and continues to suffer damages, including but not limited to: lost wages, lost benefits, damage to her career and professional reputation, future

15

pecuniary losses, emotional distress, mental anguish, humiliation, embarrassment, and other compensatory damages.

99. Plaintiff is entitled to liquidated damages under the ADEA due to Defendant's willful conduct.

**COUNT II**
**DISCRIMINATION IN VIOLATION OF MICHIGAN'S**
**ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**DISPARATE TREATMENT BASED ON AGE**

100. Plaintiff incorporates by reference the foregoing paragraphs.

101. At all relevant times, Defendant was an "employer" within the meaning of the ELCRA, M.C.L § 37.2201(a), employing one or more persons.

102. The ELCRA prohibits discrimination based on age, specifically prohibiting an employer from "discharg[ing] or otherwise discriminat[ing] against an individual with respect to employment . . . because of . . . age." MCL § 37.2202(1)(a).

103. At the time of her termination, Plaintiff was at least 40 years old.

104. Plaintiff was qualified for her position, as demonstrated by her 20-year record of exemplary performance, consistently exceeding sales goals, perfect attendance record (aside from protected FMLA leave), and consistently outstanding performance reviews.

105. Plaintiff was held to different standards than her younger coworkers, was subjected to the discriminatory 540-minute policy while younger employees on

16

other teams were not, and was specifically singled out by the CEO for attendance monitoring.

106. Plaintiff suffered adverse employment actions, including discriminatory treatment, harassment, and ultimately termination, while younger employees, including Ms. Watkins, were retrained and treated more favorably.

107. Defendant's stated reason for Plaintiff's termination—reduction in force—is demonstrably false and pretextual, as evidenced in part by Defendant's posting of Plaintiff's exact position six months after her termination.

108. Defendant's discriminatory conduct was willful and intentional.

109. As a direct and proximate result of Defendant's discriminatory conduct in violation of the ELCRA, Plaintiff was harmed, and continues to be harmed, suffering economic and non-economic losses, including but not limited to: lost wages, lost benefits, damages to professional reputation, emotional distress, outrage, humiliation, indignity, mental anguish, and disappointment.

## COUNT III
## DISABILITY DISCRIMINATION IN VIOLATION OF MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

110. Plaintiff incorporates by reference herein the foregoing paragraphs.

111. Plaintiff has a qualifying disability within the meaning of MCL § 37.1103(d)(i), specifically cancer in remission and the effects of cancer treatment.

17

112. Plaintiff was regarded as having a disability under MCL § 37.1103(d)(iii) by Defendant.

113. Plaintiff suffered from aggressive triple-positive breast cancer, underwent a double mastectomy, three reconstruction surgeries, three months of chemotherapy, a year of immunotherapy, and a hysterectomy with findings of multiple tumors, cysts, and masses.

114. As a result of her cancer and its treatment, Plaintiff suffers from severe neuropathy, chronic headaches, brain fog, concentration limitations, chronic fatigue, and depression.

115. These impairments substantially limit one or more of Plaintiff's major life activities, including but not limited to working, concentration, thinking, and neurological functions.

116. Despite her disability, Plaintiff's condition was unrelated to her ability to perform the duties of her position as Senior Sales Account Manager, as demonstrated by her consistent exemplary performance throughout her cancer treatment and recovery.

117. MCL § 37.1202(1)(b) provides that an employer shall not "discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability . . . that is

unrelated to the individual's ability to perform the duties of a particular job or position."

118. Defendant discriminated against Plaintiff on the basis of her disability by implementing the 540-minute policy that specifically targeted her, forcing her to work in the office despite her disability-related need for occasional remote work, categorically refusing her requests for accommodation, and singling her out for CEO monitoring and criticism.

119. Defendant discriminated against Plaintiff on the basis of her disability when she was terminated on June 5, 2025, and replaced with Ms. Watkins, a non-disabled, younger, and less experienced employee.

120. Defendant's actions were knowing, willful, and intentional.

121. As a direct and proximate result of Defendant's violations of the PWDCRA, Plaintiff has suffered and continues to suffer feelings of depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith.

122. As a further direct and proximate result of Defendant's violations, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss of and impairment of her earning capacity, and will continue to suffer such losses in the future.

19

123.   Plaintiff has been required to employ the services of an attorney to bring this lawsuit and will continue to incur additional damages in the future as a direct and proximate result the violation.

124.   As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has suffered bodily injury, feelings of depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

125.   As a further direct and proximate result of Defendant's violation of the ADA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and ability to work and will so suffer in the future; she has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

**COUNT IV**
**DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

126.   Plaintiff incorporates by reference herein the foregoing paragraphs.

127.   At all relevant times, Plaintiff was a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).

20

128.   Plaintiff has an actual disability under 42 U.S.C. § 12102(1)(A), specifically cancer in remission, which substantially limits major life activities including normal cell growth, neurological function, concentration, and thinking.

129.   Plaintiff also has a record of disability under 42 U.S.C. § 12102(1)(B), based on her history of aggressive triple-positive breast cancer and extensive treatment.

130.   Defendant perceived and/or regarded Plaintiff as having a physical disability, as evidenced by its specific monitoring of her attendance, its categorical refuse to accommodate her, and the CEO's singling her out for criticism.

131.   Plaintiff therefore was regarded as having a disability under 42 U.S.C. § 12102(1)(C).

132.   Plaintiff suffers from severe neuropathy, chronic headaches, brain fog, concentration limitations, chronic fatigue, and depression as a result of her cancer treatment.

133.   These impairments substantially limit Plaintiff's major life activities of thinking, concentration, neurological function, and working.

134.   Despite her disability, Plaintiff was at all relevant times qualified to perform the essential functions of her job as Senior Sales Account Manager, as demonstrated by her 20 years of exemplary performance, including throughout her cancer treatment and recovery.

135. Plaintiff could perform the essential functions of her job with the reasonable accommodation of occasional remote work or a hybrid work schedule.

136. Plaintiff repeatedly requested reasonable accommodations from Defendant, specifically requesting the ability to occasionally work remotely to accommodate her disability-related limitations, ongoing screenings, and medical appointments.

137. Plaintiff's supervisor, Michael Hankerd, acknowledged that Plaintiff requested to work from home due to her medical condition and symptoms.

138. Plaintiff's requested accommodation of occasional remote work would not have been unduly burdensome to Defendant, as demonstrated by: (a) Plaintiff's successful remote work during her FMLA leaves; (b) Plaintiff's 20-year history of hybrid work; (c) other employees being permitted to work remotely or hybrid; (d) the nature of Plaintiff's position; and (e) Defendant's lack of any evidence regarding undue hardship.

139. Under the ADA, employers have a "duty" to engage in an "interactive process" with employees in an attempt to determine whether, based on individualized assessment of the employee's needs, a reasonable accommodation is possible. *See* 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.2(o)(3).

140. Defendant failed to engage in any good faith interactive process with Plaintiff.

141. Defendant never conducted an individualized assessment of Plaintiff's needs.

142. Defendant never proposed any alternative accommodations.

143. Defendant never explored whether Plaintiff's requested accommodation would impose an undue hardship.

144. Defendant's categorical refusal to accommodate Plaintiff's disabilities, without any individualized assessment or good faith dialogue, violate the ADA's mandatory interactive process requirement.

145. Defendant is responsible for the breakdown and obstruction of the interactive process.

146. Defendant subjected Plaintiff to adverse employment actions based on her disability, including implementing the discriminatory 540-minute policy targeting her, singling her out for CEO monitoring and criticism, and ultimately terminating her employment on June 5, 2025.

147. Defendant replaced Plaintiff with Ms. Watkins, a non-disabled individual.

148. Defendant's actions in violation of the ADA were willful, intentional, and undertaken with malice or reckless indifference to Plaintiff's federally protected rights.

23

149. As a direct and proximate result of Defendant's violations of the ADA, Plaintiff has suffered and continues to suffer bodily injury, feelings of depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith.

150. As a further direct and proximate result of Defendant's violations of the ADA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, a loss of and impairment of her earning capacity and ability to work, and will continue to suffer such losses in the future.

151. Plaintiff has been required to employ the services of an attorney to bring this lawsuit and will continue to incur additional damages in the future.

**COUNT V**
**RETALIATION IN VIOLATION OF**
**THE AMERICANS WITH DISABILITIES ACT**

152. Plaintiff incorporates the foregoing paragraphs by reference herein.

153. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodations for her disability, specifically requesting to work remotely to accommodate her cancer-related limitations and medical needs.

154. Defendant was aware of Plaintiff's protected activity, as evidenced by Defendant's acknowledgment that Plaintiff's supervisor "was aware that Ms. Sokel was experiencing symptoms and she had proposed to him that she be allowed to work from home."

24

155. Following Plaintiff's requests for accommodation, Defendant took adverse actions against Plaintiff, including implementing the 540-minut policy, targeting her team, singling her out for CEO monitoring and criticism, and ultimately terminating her employment on June 5, 2025.

156. There is a causal connection between Plaintiff's protected activity of requesting reasonable accommodations and Defendant's adverse actions, as demonstrated by the temporal proximity and Defendant's specific targeting of Plaintiff following her accommodation requests.

157. Defendant's retaliatory conduct was willful and undertaken with malice or reckless indifference to Plaintiff's federally protected rights.

158. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages as set forth above.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in her favor and against Defendant as follows:

A. Judgment against Defendant in the amount of Plaintiff's unpaid back pay, front pay, compensatory damages, emotional distress, punitive damages, and attorney fees under the ADEA, the ELCRA, the ADA, and the PWDCRA;

B. Pre-judgment and post-judgment interest;

25

C.     An award of reasonable attorneys' fees and costs incurred in prosecuting this action; and

D.     All further relief as the Court deems just and equitable.

Respectfully submitted

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
*Attorneys for Plaintiff*
340 Beakes St. Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

Dated: January 30, 2026

26

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BRENDA SOKEL,

     Plaintiff,                           Case No.

v.                                    Hon.

SUMMIT POLYMERS, INC.,

     Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St., Suite 125
Ann Arbor, MI 48104
(844) 487-9489
Noah@hurwitzlaw.com
Grant@hurwitzlaw.com

---

## DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff Brenda Sokel, by and through her attorneys, HURWITZ LAW PLLC, hereby demand a jury trial in the above-captioned matter for all issues so triable.

                                  Respectfully submitted

                                  HURWITZ LAW PLLC

                                  */s/ Noah S. Hurwitz*
                                  Noah S. Hurwitz (P74063)
                                  Grant M. Vlahopoulos (P85633)
                                  *Attorneys for Plaintiff*

340 Beakes St. Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com

Dated: January 30, 2026                    grant@hurwitzlaw.com

2